STEWART, J.
| ,The defendant, Darrell Toubya Thomas, was convicted of attempted first degree murder, pled guilty as a second-felony habitual offender, and was sentenced to 55 years’ imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence. On appeal, the defendant raises assignments of error concerning the denial of his motion for a new trial and ineffective assistance of counsel in failing to properly investigate the case and discover the real perpetrator of the crime. Finding no error in the trial court’s denial of a new trial and finding that the claim of ineffective assistance of counsel may be raised in post-conviction relief proceedings, we affirm the defendant’s conviction and sentence.
FACTS
The following facts were established by the testimony at trial. In the early evening hours of December 13, 2010, brothers Traavis Harris (“Traavis”) and Stephan Harris (“Stephan”) drove up to the Take-a-Bag store, a/k/a Mark Scroggins’ store, on Milam Street. Shortly after, they saw the defendant jump out of a black SUV and their vehicle was hit by gunfire. Traavis, who had been in the passenger seat and was just outside the vehicle when the shooting began, was shot in the right leg. Stephan immediately drove off and took Traavis to the nearest hospital, Willis-Knighton North on Greenwood Road, where he was stabilized and then transferred to Louisiana State University Medical Center (“LSUMC”) for surgery to amputate his leg. At trial, both men testified that the defendant was the shooter, that they grew up in the same neighborhood, and that they knew him as “Main.” They denied knowing any reason why “Main” would want to shoot them.
12Corporal Wilson of the Shreveport Police Department (“SPD”) responded to a call about shots fired and found nothing amiss when he arrived at the location of the Take-a-Bag grocery store. He then received a dispatch about a gunshot victim at Willis-Knighton North, where he made contact with Traavis. According to Wilson, Traavis reported that he had been walking on Milam Street in the area of the grocery store when “Main” got out of a black SUV and shot him. Traavis also reported that “Main’s” little brother had recently been involved in another shooting. Wilson then returned to the crime scene with two other officers and located a number of shell casings.
Officer Leroy Bates testified that there were “several shell casings from a large caliber rifle on the ground” in the area of the shooting incident. Photographs were taken of the casings on the ground before they were collected for evidence. State’s Exhibit 1 containing 7, 6-2 rounds that were found in the street directly in front of the store where the shooting occurred was introduced into evidence. Officer Bates testified that the witnesses he spoke to from the store and surrounding area heard the gunshots. Apparently, none of these witnesses identified any participants in the shooting.
Detective Lowell Bowen, then in SPD’s Violent Crimes Homicide Unit, conducted the investigation. He contacted Traavis at LSUMC where he was awaiting surgery. Even though Traavis appeared to be in severe pain, medicated, and distraught, he told Detective Bowen that “Main” exited a black SUV, opened fire on them with a “chopper,” and then fled in the SUV. Traavis also stated that “Main’s” brother, Decoreyon Reed, had been |3involved in a shooting at Pinky’s Grocery. Detective Bowen had worked that case, so he returned to his office to get information on *87 “Main’s” identity. His efforts led him to the defendant, and he put together a photographic lineup. Upon returning to LSUMC, Detective Bowen interviewed Stephan, who reported the same basic facts regarding the shooting. When presented with the photographic lineup, Stephan immediately pointed to the defendant’s photo. The next day, Detective Bowen presented the lineup to Traavis, who also immediately identified the defendant as the shooter.
Detective Bowen proceeded to the home of the defendant’s mother where a large black SUV was parked in the driveway. The mother, who owned the vehicle, told Detective Bowen that the defendant had been in the SUV the night of the shooting and that he had dropped it off that same night. She allowed a search of the vehicle, but no evidence was found. Detective Bowen obtained a warrant for the defendant’s arrest. On January 25, 2011, the defendant was arrested in Vernon Parish.
Testifying on the defendant’s behalf were Rhonda Taylor (“Rhonda”), Rhonisha Taylor (“Rhonisha”), and Alvin Anderson (“Anderson”). The defendant and Rhoni-sha had two children together, but their baby daughter had died some days before the shooting at issue. Rhonda, who is Rhonisha’s mother, Rhonisha, and the defendant were together to make funeral arrangements for the baby, and they stopped at the Take-a-Bag store. Rhonda testified that when they stopped at the store, the defendant exited the vehicle, and she got into the backseat to talk with Rhonisha. Rhonda testified that the defendant ran back to the SUV as shots were being fired |4and told them to duck. When asked by defense counsel whether she saw who was shooting at whom, she replied that she did not. She testified that she did not see anyone she recognized as the shooter, and she could not say how many people were shooting. Though she said there was a lot of shooting, no shots were fired at the defendant’s vehicle. When she found out that the defendant was a suspect in the shooting, Rhonda did not contact the police on his behalf.
Rhonisha testified as to the same basic facts as her mother. She denied that the defendant was the shooter. She testified that he had been standing in front of the store talking to a guy and that she had not seen him with a weapon. Rhonisha testified that she did not see the actual shooter or shooters. After they left the scene of the shooting, the defendant brought them home and then left.. Like Rhonda, Rhoni-sha did not call the police to report that the defendant was not the shooter. She explained that she “didn’t want to ruin [her] day at the time.”
Anderson testified that he stopped the defendant to chat in front of the store. He saw the Harris brothers park toward the New Nat Café next to the store and then heard shots ring out. Anderson testified that he ran and ducked behind a blue dumpster behind the store until the shooting stopped. He then left. Anderson did not contact the police about what occurred. He also testified that he knows both the Harris family and the defendant’s family. He denied seeing the defendant with a weapon before the shooting.
The defendant testified on his own behalf at trial. His testimony mirrored the Taylors’ and Anderson’s. He testified that there were a lot of people at the store that night. While he was talking with Anderson, shots Rrang out. The defendant could not say who was doing the shooting. As for the Harris brothers, the defendant claimed that they had pulled in the New Nat Café lot by a tall white fence that separates the two businesses. He testified that he could not really see them because of the fence, so he did not under *88 stand how they claim to have seen him.[1] The defendant denied having a weapon. He testified that after the shooting he took Rhonda and Rhonisha home, dropped off the SUV at his mother’s house, left with a friend to go out, and later went to another girl’s house. The defendant did admit to having some ongoing issue with the Harris brothers about a car, but he denied ever having had a fight with them. He asserted that they accused him of the shooting because they recognized his mother’s vehicle and assumed he shot at them.
After hearing the conflicting testimony, the jury by a vote of 11-1 returned a verdict of guilty as charged of one count of attempted first degree murder. The defendant was sentenced on September 30, 2011, to 48 years’ imprisonment at hard labor, without benefits. The state then charged him as a second-felony habitual offender. By plea agreement on December 21, 2011, the defendant plead guilty to the multi-bill in exchange for a sentence of 55 years’ imprisonment at hard labor, without benefits.
In the meantime, on November 9, 2011, with new counsel, the defendant filed a motion for a new trial on the grounds of newly discovered evidence that would establish his innocence and would have resulted in a | ^different verdict if it had been presented to the jury.[2] Attached to the motion was an affidavit purportedly signed by Cordarly Chappie (“Chappie”) on October 28, 2011. The affidavit states:
1. My name is Cordarly Chappie.
2. I am aware that Darrell Thomas had been convicted of a crime which he did not commit.
3. Travis (sic) Harris and Stephen (sic) Harris and at least one other person had threatened and had shot at me and for my own protection I borrowed an AKA semi-automatic rifle from a friend.
4. At the incident for which Darrell Thomas was convicted, I was shot at and I fired the AKA back at the people who were shooting at me.
5. Darrell Thomas had no firearm and did no shooting.
Opposing the motion, the state argued that the Chappie affidavit was insufficient to qualify as new and material evidence that would justify a new trial under La. C. Cr. P. art. 851(3). The state noted that the jury had already rejected the claim that the defendant was not the shooter and that none of the defendant’s witnesses had testified that Chappie was the shooter. The state posited that even if Chappie was involved in the shooting, the defense must have known this at the time of trial; therefore, the information was not new.
The motion for a new trial was heard on June 12, 2012. Defense counsel, Ransdell Keene, asserted that Chappie appeared in his office and executed the affidavit in which he admitted to being the shooter. To support the affidavit, Keene informed the trial court that Rhonda and Rhonisha were |7available to testify that trial counsel, Danny Scarborough, never asked them who the real shooter was and that they would have identified Chappie had they had been asked at trial. Keene also noted that trial counsel had been diagnosed with a serious medical condition sometime after *89 trial and suggested that his performance as trial counsel was lacking.
The state countered that the motion should be denied without any testimony because the information was apparently known to the witnesses at trial when they had the opportunity to testify.
After hearing arguments, the trial court denied the motion for a new trial. Noting that the evidence was sufficient for the jury to find the defendant guilty beyond a reasonable doubt, the trial court stated that it concurred entirely with what the jury did and had no qualms about its decision. Referring to the purported new evidence, the trial court observed that the likely outcome if the matter went forward would be that Chappie would recant his admission. Finally, with respect to the argument regarding trial counsel’s performance, the trial court noted that Mr. Scarborough “did a good job at trial” and that he “found no fault with his conduct at the trial.”
The defendant’s appeal followed.
DISCUSSION
The defendant raises two assignments of error. First, he asserts that the trial court erred in denying the motion for a new trial without conducting an evidentia-ry hearing where the motion included an affidavit by Chappie ^admitting to the crime and raised the issue of the defendant’s actual innocence. The defendant asserts that the denial was not in the interest of justice. Second, the defendant asserts that trial counsel was ineffective in failing to investigate the case properly so as to discover the evidence that was available to show the real perpetrator of the shooting.

Denial of Motion for a New Trial

In pertinent part, La. C. Cr. P. art. 851 provides:
The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever:
(8) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty;
(5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.
The defendant based his motion for a new trial on the grounds of newly discovered evidence. To obtain a new trial on the basis of newly discovered evidence, the defendant has the burden of showing: (1) the new evidence was discovered after trial; (2) the failure to discover the evidence at the time of the trial was not caused by a lack of diligence; (3) the evidence is material to the issues at trial; and (4) the evidence is of such a nature that it would probably have produced a different verdict. State v. Hammons, 597 So.2d 990, 994 (La.1992); State v.Watts, 2000-0602, p. 6 (La.1/14/03), 835 So.2d 441, 447.
In ruling on a motion for a new trial based on newly discovered evidence, the trial judge’s “duty is not to weigh the new evidence as though he were a jury determining guilt or innocence, rather his duty is the narrow one of ascertaining whether there is new material fit for a new *90 jury’s judgment.” State v. Prudholm, 446 So.2d 729, 736 (La.1984). The decision of whether to grant or deny a motion for new trial is within the trial judge’s sound discretion. State v. Brisban, 2000-3437 (La.2/26/02), 809 So.2d 923; State v. Quimby, 419 So.2d 951, 960 (La.1982).
Though the defendant based his motion on newly discovered evidence, it is clear that he cannot show that the evidence was discovered after trial or that the failure to discover the evidence was not due to a lack of diligence on the part of the defense. Mr. Keene asserts that upon becoming new counsel for the defendant after the trial, he interviewed the Taylors (Rhonda and Rhonisha) and learned that they knew who the shooter was. The defendant’s memorandum in support of his motion for a new trial states that “no one asked at the trial who the other male adult was in the Thomas vehicle at the time of the shooting.” According to Mr. Keene, the Tay-lors indicated that trial counsel, Mr. Scarborough, never asked them about the real shooter and that they were prepared to testify that the shooter was Chappie. Presumably, Chappie was the “other male adult in the Thomas vehicle at the time of the shooting.” Mr. Keene claims that he located Chappie and obtained his affidavit admitting to the shooting. Notably, Mr. 1 ipKeene did not have Chappie available at court to testify as to his alleged guilt under oath on the day the motion for a new trial was heard.
The claim that Rhonda and Rhonisha knew who the shooter was and would have testified that it was Chappie if only defense counsel had asked them shows that the evidence upon which the motion for a new trial is based is not newly discovered evidence. If Chappie was in the vehicle with the defendant and the Taylors, then they all would have known that he was the shooter. However, no one mentioned Chappie at trial or even that someone else was with them in the SUV. Moreover, a review of the trial transcript shows, contrary to what has been asserted by Mr. Keene in support of the motion for a new trial, that the Taylors had the opportunity when questioned by trial counsel for the defense to identify the shooter as Chappie. When questioning Rhonda, Mr. Scarborough asked the following questions and received the following answers:
Q. Did you see who was shooting at whom?
A. No, we didn’t because we was ducked down, me and my daughter.
Q. Did you happen to see anybody that you recognized as the shooter?
A. No.
Mr. Scarborough also asked Rhonisha the following question and received the following answer:
Q. Did you actually see who were the shooters?
A. No.
|nThe above testimony from trial shows that trial counsel, Mr. Scarborough, directly questioned the Taylors about whether they could identify the shooter. Both women testified under oath that they could not. The Taylors had the opportunity to identify Chappie as the shooter and did not do so. The purported new evidence could have easily been discovered prior to or during trial if the Taylors had gone to the police with the information they apparently now claim to have had about the shooter or if they had testified differently at trial.
On this record, the defendant has not shown that a new trial is warranted due to newly discovered evidence or to serve the ends of justice. Accordingly, we find no abuse of discretion by the trial court in denying the motion for a new trial.
*91 Nor do we find that the trial court erred in failing to conduct an evidentiary hearing on the motion for a new trial. La. C. Cr. P. art. 852 provides that a motion for a new trial shall be tried contradictorily with the district attorney. This provision does not require an eviden-tiary hearing. Rather, the method of hearing motions for a new trial is within the trial judge’s discretion and may be tried solely on affidavits. State v. Varnado, 154 La. 575, 97 So. 865 (La.1923).[3] “If the reading of the motion imparts to him sufficient knowledge to enable him to intelligently dispose of the matter, he cannot be arbitrarily required to delay his ruling for the purpose of further hearing or argument.” Id., at 868. More recently, in Brisban, supra, the supreme court found no error by the trial court in denying a motion for a new trial without an evidentiary hearing. The court found that reading the defendant’s motion, along with the affidavit by a codefendant which was the basis for the motion, “gave the trial court sufficient knowledge to enable him to intelligently dispose of the matter.” Id., at 2000-8437, p. 11, 809 So.2d at 931. The court noted that an evidentiary hearing would have been repetitious of the information in the affidavit. Id. See also State v. Barfield, 292 So.2d 580 (La.1974), and State v. Jackson, 570 So.2d 227 (La.App. 5th Cir.1990).
Here, the trial court had before it the motion for a new trial, the memorandum in support of the motion, and the Chappie affidavit. The trial court had the benefit of having heard and observed Rhonda and Rhonisha testify at trial. Additionally, the trial court heard arguments from both sides. We find on this record that the trial court had all it needed to be able to intelligently dispose of the matter.

Ineffective Assistance of Counsel

Claims of ineffective assistance of counsel must both identify specific acts or omissions by counsel and state how these actions resulted in actual prejudice so severe that the defendant was denied a fair trial. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Jordan, 35,643 (La.App.2d Cir.4/3/02), 813 So.2d 1123, writ denied, 2002-1570 (La.5/30/03), 845 So.2d 1067. Generally, claims of ineffective assistance of counsel are more properly addressed by an application for post-conviction relief filed in the trial court where a full eviden-tiary hearing may be conducted. Prudholm, supra; State v. Gay, 616 So.2d 1290 (La.App. 2d Cir.1993), writ denied, 624 So.2d 1223 (La.1993). Ineffective assistance of counsel issues may be considered on appeal where the defendant had the opportunity to and did produce evidence on the issue in the trial court and where the record contains sufficient evidence to rule on the merits of the claim. Gay, supra.
Here, defendant claims that trial counsel did not properly investigate the case to discover the real perpetrator of the crime, allegedly Chappie. As previously addressed, trial counsel directly questioned the Taylors at trial about whether they could identify the shooter, and both testified that they could not. None of the defendant’s witnesses, including the defendant himself, identified any other person as the shooter when questioned by trial counsel. The jury heard and rejected the testimony that the defendant was not the shooter. This case turned on the credibili *92 ty of the -witnesses, and the jury chose to accept the testimony of the Harris brothers, who identified the defendant as the shooter within hours of the incident, over the testimony of the defendant and his witnesses, who simply claimed that the defendant did not do it. The jury as the trier of fact may accept or reject the testimony of any witness in whole or in part, and a reviewing court accords great deference to a jury’s decision. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685, writ denied, 2009-0725 (La.12/11/09), 23 So.3d 913, cert. denied, _ U.S. _, 130 S.Ct. 3472, 177 L.Ed.2d 1068 (2010); State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 2007-1209 (La.12/14/07), 970 So.2d 529.
Nevertheless, the defendant did not have the opportunity in the trial court to produce evidence to show that trial counsel was ineffective in | ^investigating the matter and failing to discover that Chappie was, allegedly, the actual perpetrator. Though we note from the record that trial counsel did question the defense witnesses about the actual shooter during their testimony, the record does not contain sufficient evidence to allow this court to otherwise evaluate an ineffective assistance of counsel claim as it otherwise relates to the Chappie affidavit. Therefore, we preter-mit any ruling on the ineffective assistance of counsel claim, which is preserved for the defendant to raise, if he so chooses, by application for post-conviction relief.
CONCLUSION
For the reasons stated, we affirm the defendant’s conviction and sentence.
AFFIRMED.

. Of course, the defendant's comment raises the question of how he saw the Harris brothers if they were separated by a tall fence.

. La. C. Cr. P. art. 853 provides that a motion for a new trial must be filed and disposed of before sentencing; however, a motion based on new evidence under La. C. Cr. P. art. 851(3) may be filed within one year after the verdict or trial court’s judgment. Thus, the motion for a new trial in this matter was timely.

. The supreme court in Brisban, supra, noted that though there was no statutory authorization or procedural rules for a motion for a new trial by a defendant at the time of the Vamado decision, its pronouncements regarding the hearing of such motions remain "soundly reasoned.” See Brisban, supra, FN 2.