Judgment rendered May 25, 2022.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 54,281-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA     Appellee

versus

FURLONZO R. MORAN     Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 355,710

Honorable Christopher T. Victory, Judge

* * * * *

LOUISIANA APPELLATE PROJECT   Counsel for Appellant
By: Peggy J. Sullivan

FURLONZO R. MORAN     Pro Se

JAMES E. STEWART, SR.     Counsel for Appellee
District Attorney

WILLIAM JACOB EDWARDS
KODIE K. SMITH
REBECCA ARMAND EDWARDS
Assistant District Attorneys

* * * * *

Before MOORE, PITMAN, and ROBINSON, JJ.

**ROBINSON, J.**

Furlonzo Moran appeals his second degree murder conviction for the 2017 shooting death of Samuel Johns. For the reasons below, we affirm his conviction and sentence.

## FACTS

Early in the evening on December 4, 2017, Shreveport Police Department ("SPD") officers were called to the scene of a shooting on Talbot Street in Shreveport. When officers arrived, they found Furlonzo Moran standing near the corner of Talbot and Elder Streets. Moran told officers that he shot Johns because Johns had tried to kill him. Johns was discovered dead in the yard of a residence located at 2008 Talbot Street.

On April 18, 2018, Moran was indicted by a Caddo Parish grand jury for the second degree murder of Johns. On July 30, 2018, the trial court granted the State's motion for the appointment of a sanity commission. Dr. Astik Joshi and Dr. Marc Colon issued their report on November 21, 2018. They opined that Moran had the capacity to understand the proceedings against him and was capable of assisting in his defense.

On October 15, 2019, the State filed a La. C.E. art. 404(B) notice concerning postings of a violent nature made by Moran to his Facebook account between November 29 and December 2, 2017. On November 21, 2019, the trial court ruled that the Facebook posts would be admissible to the extent they contained threats. Moran applied for a supervisory writ with this court concerning the 404(B) ruling. This court denied the writ on March 11, 2020.

*Trial*

A jury trial was held in this matter from September 29 to October 1, 2020. On the second day of trial, a juror, Ms. Horace Gibbs, informed the court that a woman in the audience had pulled down her mask in order to get Gibbs' attention. Gibbs recognized the woman as a distant cousin of her late husband. Over defense counsel's objection, the court removed Gibbs as a juror and replaced her with an alternate juror.

Terry Cooper testified concerning what he witnessed leading up to the shooting. Cooper shared a home at 2008 Talbot Street with the late Cynthia Joseph. Upon returning home from work at around 5:00 p.m. on the date of the shooting, he saw Joseph feeding a cat in their yard and two men across the street in a field looking at a car. When Cooper later looked outside, he saw Joseph speaking to someone across the street.

Cooper next saw Joseph return to her yard with a young man following her as they talked. He did not hear any raised voices, Joseph did not appear to be nervous or afraid, and he did not see any weapons. Cooper acknowledged that he was not paying attention to whether people were raising their voices while he was in the house.

After Cooper went to the kitchen, located at the rear of the house, he heard Joseph yell, "they shooting." As Cooper looked through the open front door, he saw a young man with a gun pointed toward the house. He observed that the man that Joseph had been conversing with was being shot at as he ran toward their house. He thought that the man was going to run into their house. Joseph came into the house and tried to close the door. After the shooting stopped, they looked outside and the man with the gun told Joseph to call 911. Cooper described the gunshots as being consecutive.

2

Cooper and Joseph remained in the house until police arrived. The young man who had been shot was on the ground in their front yard.

Cooper testified that he never saw the victim with a weapon, but conceded that he did not get close to the body. Cooper could not remember the face of the shooter. When Cooper was asked what evidence he had that the shooting was not in self-defense, he answered that all he knew was that he only saw one gun.

Willie White was walking east on Ford Street to his home when he heard six gunshots and saw a man wearing gray clothing run across the street heading north from the direction of Talbot Street. He believed the shots continued after he saw the man, but he did not see who was doing the shooting. He believed that the man that he saw running was the target of the shots, but did not know if the man was hit. He did not recall seeing a gun in the man's hand, and he did not hear any commotion or yelling prior to hearing the shots fired. White tried to help children to safety after hearing the gunshots, and then he called 911.

Officer Yolanda Williams, a supervisor and records custodian with the communications division of the SPD, testified concerning event chronologies generated for two 911 calls received on December 4, 2017. One call was made at 5:59 p.m., and the other call was made one minute later. The calls were recorded. In one recording played for the jury, Moran is heard telling the operator that "S.I." had tried to kill him over Facebook posts and had been in the yard with a gun in his hand. He also told the operator that S.I. had tried to shoot him. It was later determined that S.I. was the victim's nickname. Williams testified that she heard Moran say on the recorded call that he was not going to run or hide but was going to wait

3

there for the police. She also testified that she heard Moran say that he had to kill Johns because Johns would kill him.

Officer Daryl Council was a patrol officer for the SPD. He responded to a "shots fired" 911 call at 5:59 p.m. Council saw Moran standing near a stop sign with his hands up. Moran let Council know that a gun was near his foot. That gun was a Glock 21 at slide lock, and a magazine was next to it on the ground. Council explained the Glock's slide will lock back on its own after the last round is fired. Council stood outside another officer's patrol car after Moran was Mirandized and placed in it. Council recalled from looking at his police report that Moran said he shot S.I. because he believed that his life was in danger.

Corporal John Scheen was a patrol officer with the SPD. He responded to a "shots fired" call. The victim was facedown on the ground when he arrived because the fire department had not yet attempted to treat him. A gun was in the grass about one foot away from Johns' body, with his left hand closer to the gun. Next to the gun was a magazine. Scheen thought it was odd to find a gun lying there with the magazine beside it. Scheen testified that the slide and the trigger were in a ready-to-fire position. Scheen also testified that the gun as it appeared in photos had not been touched because he directed an officer to stand with the body and the weapon until crime scene investigators arrived.

Corporal Matthew O'Neal was a patrol officer with the SPD. When he arrived at the scene, Moran was standing near the stop sign at the intersection of Elder and Talbot Streets and was flagging him down. Moran said that he told the man to leave him alone. There was a Glock handgun on the ground next to Moran. O'Neal was not sure if the magazine was in the

4

weapon, but the gun was locked to the rear indicating that it had been fired. Moran was placed in the back of O'Neal's patrol car where he was Mirandized. Moran remained in the car while officers were at the scene until he was taken to the SPD to be interviewed by detectives.

Mobile Video System ("MVS") video showed that when O'Neal pulled up to Moran's location, Moran told him that he had to shoot Johns because he was trying to kill him. He also mentioned that Johns had shot an individual nicknamed "13." After Moran was placed in the back of O'Neal's patrol car, the MVS video captured Moran banging his head against the divider in O'Neal's patrol car after inquiring about and learning of Johns' condition.

Moran remained in O'Neal's patrol car at the scene and then after being transported to the SPD headquarters to await the arrival of detectives to interview him. The MVS recorded Moran talking about Facebook posts, warnings from the victim about those posts, and "13." Moran said that: (i) Johns had a gun on his side, indicated it was in Johns' waistband, and that he was not going to let Johns sneak him; (ii) he was going to give $20 to Johns for a woman's drug debt so Johns would leave her alone; (iii) he was helping the police solve murders; (iv) Johns told him he "smoked" "13" and that was his work; (v) when Moran said he wanted to fight Johns because of what happened to "13," Johns showed him a gun; (vi) he shot Johns when Johns acted like he was going for his gun; (vii) Johns was getting ready to shoot the woman in the yard, and he was going to pay her debt; (viii) Johns was mad about Moran's Facebook posts and thought that he had been snitching on Johns about some drugs; (ix) he did not think that Johns should kill that woman over some crack; (x) Johns thought he was naïve since he turned

5

himself to God; (xi) Johns did not know he had a gun when Johns showed him the gun; (xii) he is not a fool even though he has turned to God; (xiii) Johns let him see the gun he was grabbing on; (xiv) Johns was going to smoke him; (xv) Johns was going to take him somewhere after confessing to shooting some boy; (xvi) he knew Johns as "S.I."; and (xvii) Johns put him in the frame of mind that the woman who owed the drug debt was his mother.

O'Neal testified that one of the first things that Moran said to him was that he had to shoot Johns because Johns was going to kill him. He also testified that although it was not recorded on any of the videos, Moran said he fired his gun toward Johns' head. He also heard Moran say Johns was hiding the gun under his arm, Johns was talking about coming into his house, and he tried to use Facebook to help police. O'Neal agreed that Moran was doing a lot of rambling.

O'Neal also testified that Moran repeatedly said he was a snitch and that they were trying to kill him for snitching. O'Neal thought Moran was heartbroken and upset when he learned that Johns was dead, and he banged his head against the glass divider. Moran banged his head against the divider several other times as well. O'Neal agreed that Moran expressed anger regarding Johns. He became angry after Johns admitted to killing "13" and said that was Johns' "ass." At the request of detectives, Moran was taken to LSU Hospital for a psychiatric evaluation.

Sergeant Jennifer White worked with the SPD's crime scene investigative unit. White, who arrived at the scene at approximately 7:00 p.m., described the scene that she encountered. An open field was across the street from the yard where Johns was found. A Chevrolet Camaro that had

6

been driven by Moran was parked in the field. It was the only vehicle in the field.

White took photographs of the scene and collected evidence. A slipper and two .45 casings were found in the driveway. A second slipper was found farther up the driveway. There was some blood spatter on the edge of the driveway near the second slipper. An article of clothing was also discovered along the driveway edge. Additional blood spatter and a hat were near the driveway. According to White, there was a blood spatter trail leading toward Johns. A small digital scale of the type often used to weigh drugs, a gun, and a magazine were on the ground to the left of Johns.

White testified that the gun found near Johns' body was a Smith & Wesson .40 handgun. When she examined it, the slide of the gun was not back and the trigger was in the forward position. Before photographing the gun, she pulled the slide back to clear it but there was no round in the chamber. There were 15 rounds in the magazine. White did not see any blood on the magazine or on the gun's grip and trigger even though the victim had a lot of blood on his right hand. She admitted that she did not know if the gun was in Johns' hand before or after he got blood on his hand. There was a spot of potential blood on the gun's slide. There was no blood on the scale, and she did not see blood on the ground in the location of the gun, magazine, or scale. A sock holding a glass jar containing bags of suspected powder and rock cocaine and Ecstasy pills was found near the victim. There were possible blood stains on the sock.

White also identified three .45 casings found near the victim. When an employee of the coroner's office rolled Johns over onto his back, White found three additional .45 casings. After the victim's body was removed,

7

two more .45 casings were found. A lead projectile was also found under his body. Ten .45 casings were found by White in the yard at 2008 Talbot St. White identified the firearm recovered next to Moran as a Glock model 21 .45 handgun. As noted earlier, the gun found near Jones was a .40 handgun. According to White, no .40 casings were found at the scene.

Detective Taywania Jackson was an investigator with the SPD's violent crimes unit. She arrived on scene at approximately 6:00 p.m. She testified that casings went from the driveway into the yard where the body was found. She saw blood spatters that began at the entrance of the driveway and led over to the body. One slipper was close to the entrance of the driveway and the other one was in the yard. Johns' hands were bloody and there was an extreme amount of blood on the inside of his hands. Johns was wearing gray sweatpants. She did not conduct any formal interviews at the scene.

Jackson interviewed Moran at the SPD at approximately 8:33 p.m. Early in the interview, Moran requested that defense counsel be contacted. Video recorded in the interview room showed that after Jackson left the room, Moran began writing on the Miranda rights waiver form. After writing on it for some time, he held the form up toward the interview room's camera. Moran had written on the form: (i) "1# God is real"; (ii) "Do people right"; (iii) "God he see everything"; (iv) "I don't like when people sneak and kill my friends. I told him don't tell me shit bout no murder. I don't understand killin!"; (v) "I told him leave me alone to many times"; (vi) "He evil and he a snake Im sorry"; (vii) "I'm ok"; and (viii) "I saved my life and other peoples two[.]"

8

The video shows that when Jackson returned to the room, Moran handed her the form and when she asked what it was, he replied, "Everything that you want to know." The video also shows that Moran began talking to Jackson and another detective who was present. Moran said that Johns got his offer to pray mixed up with snitching. Moran stated that he had already felt Johns was coming to kill him and that was why he was prepared for him. Moran said he was sick of knowing what Johns had done, and he added that Johns beat on women. Moran stated that he finally released his anger for Johns when he shot him. He also stated that he could have shot Johns in the leg but did not because then Johns would have "smoked" one of his relatives. Moran asserted that he tried to "dry snitch" on Johns, but Johns had figured it out. He claimed that Johns tried to "smash" him, but Johns was the one who got smashed.

Detective Jackson testified that another detective advised her that he found what he believed was Moran's Facebook page and suggested that she look at it. She searched for it and found it as well. She was hoping to find statements made in reference to Moran being homicidal and possibly references to Johns. A selection of sixteen of Moran's posts was accepted into evidence over defense counsel's objections. The earliest post was made on November 29, 2017, and the latest was made on December 2, 2017. Jackson read those sixteen posts at trial.

On cross-examination, Jackson admitted that those were not all of the posts that she pulled from Moran's Facebook page. The State had prepared the selection of posts presented at trial. She also testified that Johns went by the nickname of "S.I." She did not recall seeing Johns' name or "S.I."

mentioned in the Facebook posts that she had pulled. Johns was not referenced by name or nickname in the sixteen posts presented at trial.

Milton Carroll, III, was a death investigator for the Caddo Parish Coroner. EMS had already pronounced Johns dead when Carroll arrived on scene. He described how he investigated the scene, photographed the body, collected items, and prepared Johns for transport. He testified that a casing was recovered from the body bag, and that three projectiles were ultimately recovered from Johns' body.

Katy Traweek was a DNA analyst at the North Louisiana Crime Lab. She testified as an expert in the field of forensic DNA analysis. She stated that Johns' DNA was consistent with the DNA profiles found in three swabs of suspected blood taken from the driveway.

Carla White was a senior forensic scientist at the North Louisiana Crime Lab. She testified as an expert in firearm identification. She analyzed a .45 Glock handgun model 21 and a .40 Smith & Wesson handgun model SW40VE. She compared five projectiles submitted to the crime lab to the .45 handgun, but was unable to make a positive identification due to the polygonal rifling common to Glock handguns. However, there were class characteristics that showed the projectiles had been fired from a gun similar to the .45 handgun. She also concluded that the eleven .45 casings were fired from the .45 handgun.[1] Finally, she concluded that the .40 handgun was not a functioning firearm. She found suspected blood on the right side of the .40 handgun's slide, but did not see any suspected blood on its handle or trigger.

---

[1] Sergeant Carla White testified that ten .45 casings were found at the scene. The eleventh casing was found in the body bag.

10

Dr. Long Jin, who performed the autopsy on Johns, testified as an expert in forensic pathology. He stated that Johns, who died from multiple gunshot wounds, had methamphetamine and marijuana in his system at the time of death.

Dr. Jin testified concerning photos taken during the autopsy. Eleven gunshot entry wounds were identified. One wound was to the neck. There were seven gunshot wounds to the back. The projectile trajectories of two shots to the right upper back were back to front, right to left, and top to bottom. The projectile trajectories of three shots to the left back were back to front, bottom to top, and left to right. Those three projectiles exited the chest. The projectile trajectory of a shot to the right lower back was back to front, bottom to top, and right to left. That projectile remained in the chest wall. The projectile trajectory of a shot to the left lower back was back to front, bottom to top, and left to right. There were two wounds described by Dr. Jin as being consistent with defensive wounds. One such wound was to the right upper arm, and the projectile remained there. The other such wound was to the left forearm. The eleventh wound was to the left upper leg with the projectile trajectory being from front to back, right to left, and top to bottom.

Dr. Jin testified that he did not know the order in which the gunshots were sustained. There were no entry wounds to Johns' chest. Based on his examination, Dr. Jin concluded that at one point the victim had his back to the shooter.

The defense rested after the State presented its evidence. The jury unanimously convicted Moran of the second degree murder of Johns. On December 9, 2020, Moran received the mandated sentence of life

imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence.

On December 10, 2020, Moran filed a motion for new trial in which he contended, among other things, that an eyewitness came forward after the guilty verdict to say that he/she saw an officer pick up a firearm on or near Johns, remove the magazine, and then place the firearm and the clip near each other for photographing. That motion and a motion for a post-verdict judgment of acquittal were denied on December 14, 2020, with the court writing that Moran had already been sentenced. On January 6, 2021, Moran filed a motion to reconsider sentence. That motion was also denied.

Moran has appealed his conviction. His appellate counsel maintains that: (i) Moran acted in self-defense and the State failed to prove beyond a reasonable doubt that Moran was guilty of second degree murder; (ii) in the alternative, the evidence supported only a manslaughter conviction; (iii) the trial court erred in denying the motion for new trial without a hearing; (iv) the trial court erred in removing the juror Gibbs and seating an alternate juror; and (v) the trial court erred in allowing the introduction of irrelevant Facebook posts when their prejudicial effect outweighed their probative value.

Moran has filed a *pro se* brief. He argues that the trial court abused its discretion when it removed Gibbs. He further argues that the trial court erred in allowing the jury to view the autopsy report and the Miranda rights form during deliberations.

### Sufficiency of the evidence

Moran's appellate counsel contends that Moran acted in self-defense when he reacted to Johns showing him a handgun. Counsel maintains in the

alternative that if Moran was not acting in self-defense, the evidence only supported a conviction of manslaughter.

When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court must first determine the sufficiency of the evidence because the accused may be entitled to an acquittal, which would render other errors moot. *State v. Hearold*, 603 So. 2d 731 (La. 1992); *State v. Patterson*, 50,305 (La. App. 2 Cir. 11/18/15), 184 So. 3d 739, *writ denied*, 15-2333 (La. 3/24/16), 190 So. 3d 1190.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517; *State v. Dotie*, 43,819 (La. App. 2 Cir. 1/14/09), 1 So. 3d 833, *writ denied*, 09-0310 (La. 11/6/09), 21 So. 3d 297.

The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. *State v. Casey*, 99-0023 (La. 1/26/00), 775 So. 2d 1022, *cert. denied*, 531 U.S. 840, 121 S. Ct. 104, 148 L. Ed. 2d 62 (2000). The appellate court does not assess credibility or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442; *State v.*

*Green*, 49,741 (La. App. 2 Cir. 4/15/15), 164 So. 3d 331. A reviewing court affords great deference to the trier of fact's decision to accept or reject the testimony of a witness in whole or in part. *State v. Jackson*, 53,497 (La. App. 2 Cir. 5/20/20), 296 So. 3d 1156; *State v. Broadway*, 53,105 (La. App. 2 Cir. 1/15/20), 288 So. 3d 903, *writ denied*, 20-00372 (La. 7/24/20), 299 So. 3d 78.

Direct evidence provides proof of the existence of a fact, for example, a witness's testimony that he saw or heard something. *State v. Lilly*, 468 So. 2d 1154 (La. 1985). Circumstantial evidence provides proof of collateral facts and circumstances, from which the existence of the main fact may be inferred according to reason and common experience. *Id.* When the State relies on circumstantial evidence to establish the existence of an essential element of a crime, the court must assume every fact that the evidence tends to prove and the circumstantial evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438; *State v. Lilly*, *supra*; *State v. Green*, *supra*.

Moran was convicted as charged of second degree murder, which is defined in La. R.S. 14:30.1 as:

> A. Second degree murder is the killing of a human being:
> (1) When the offender has a specific intent to kill or to inflict great bodily harm; or
> (2) When the offender is engaged in the perpetration or attempted perpetration of aggravated or first degree rape, forcible or second degree rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, assault by drive-by shooting, armed robbery, first degree robbery, second degree robbery, simple robbery, cruelty to juveniles, second degree cruelty to juveniles, or terrorism, even though he has no intent to kill or to inflict great bodily harm.
> . . . . .

The punishment for a conviction of second degree murder is life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. La. R.S. 14:30.1(B).

In her alternative argument concerning manslaughter, appellate counsel cites the definition of manslaughter found in La. R.S. 14:31(A)(1): "A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. . . ."

A homicide is justified when it is committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. La. R.S. 14:20(A)(1). When self-defense is raised as an issue by the defendant, the State has the burden of proving, beyond a reasonable doubt, that the homicide was not perpetrated in self-defense. *State ex rel. D.P.B.*, 02-1742 (La. 5/20/03), 846 So. 2d 753; *State v. Allen*, 50,703 (La. App. 2 Cir. 8/10/16), 200 So. 3d 376, *writ denied*, 16-1734 (La. 9/6/17), 224 So. 3d 981. When the defendant challenges the sufficiency of the evidence in a self-defense case, the question becomes whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense. *State v. Matthews*, 464 So. 2d 298 (La.1985); *State v. Allen*, *supra*.

Terry Cooper, who witnessed the events from inside 2008 Talbot, testified that he only saw the shooter with a gun. The evidence shows that

15

Johns sustained two defensive wounds to the arms and was shot seven times in the back. There was a trail of blood and belongings along the driveway edge and into the yard, which indicated that Johns was attempting to flee from his killer.

Moran gave various explanations to officers and detectives for why he shot Johns. He told them that Johns showed him a gun, so he got the jump on Johns because he feared for his life. This apparently stemmed from Facebook posts made by Moran. He also indicated that he attempted to intervene on behalf of the late Cynthia Joseph, who apparently owed money to Johns for drugs. Officer O'Neal testified that Moran stated he became angry at Johns when he admitted to killing Moran's friend "13" and that was Johns' "ass." Finally, Moran told detectives that he released his anger for Johns when he shot him.

A rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense. The evidence did not show that Moran reasonably believed that he was in imminent danger of losing his life or receiving great bodily harm and that shooting a fleeing Johns was necessary to save himself from that danger. Moreover, the evidence established the essential elements of second degree murder beyond a reasonable doubt. Appellate counsel's arguments regarding sufficiency of the evidence are without merit.

### Juror removal

Moran's appellate counsel argues that Ms. Horace Gibbs, a juror, was inappropriately removed from the jury, and that action improperly deprived Moran of the jury chosen to hear his case.

16

Gibbs told the court that a woman in the audience was a third or fourth cousin of her late husband. Gibbs stated that the woman pulled down her mask and smiled in what Gibbs believed was an attempt to get Gibbs to recognize her.

Gibbs did not know the woman's last name. She had not seen the woman since at least when her husband died in 2013. She explained that the woman would bring her young son with her to Gibbs' house when she cut Gibbs' son's hair approximately twenty-five years earlier. However, she did not know if Moran was the woman's son.

Gibbs denied that knowing the woman in the audience would cause her to be partial to or show favoritism to either the defense or the prosecution, or cause her to have any discomfort or unease.

The State argued that it was placed in a "bad position" since it did not have that knowledge during jury selection. The State also argued that it was most concerned that there had been an apparent attempt to influence a juror. Defense counsel maintained that Gibbs had been rehabilitated after questioning by the trial judge, defense counsel, and the State.

The name of the woman was not placed in the record as defense trial counsel was not forthcoming with her identity. In fact, defense counsel stated, "[W]e don't even know who she is; I do but you guys don't and Ms. Gibbs doesn't either." Unfortunately and surprisingly, her relationship to Moran was not established in this record.

The court ordered Gibbs removed from the jury on the grounds that the woman in question was presumably a member of Moran's family, she was related to Gibbs' late husband, she used to cut Gibbs' son's hair and had a son near the age of Gibbs' son, and the State may have used a peremptory

17

challenge against Gibbs during jury selection if it had this knowledge beforehand. The court also denied a defense motion for a mistrial.

Once a jury has been selected and sworn the accused has a right to have his fate decided by the particular jurors selected to try him. *State v. Cass*, 356 So. 2d 396 (La. 1977). This right of the accused is a substantial one, the improper deprivation of which is prejudicial. *State v. White*, 244 La. 585, 153 So. 2d 401 (La. 1963). Thus, harmless error is inapplicable. *Id.*

If it is discovered after a juror has been accepted and sworn, that he is incompetent to serve, the court may, at any time before the first witness is sworn, order the juror removed and the panel completed in the ordinary course. La. C. Cr. P. art. 796. The phrase "incompetent to serve" embodied in art. 796 refers to death, illness, or any other cause which renders a juror unfit or disqualified to perform his duty as prescribed. *State v. Cass*, *supra*. Gibbs was removed on the second day of the jury hearing testimony.

A defendant's right to have the original twelve jurors selected decide his fate is not absolute. *State v. Orphey*, 20-167 (La. App. 3 Cir. 10/28/20), 306 So. 3d 550, *writs denied*, 20-01374 (La. 3/9/21), 312 So. 3d 585, and 20-01473 (La. 3/9/21), 312 So. 3d 587. Alternate jurors, in the order in which they are called, shall replace jurors who become unable to perform or disqualified from performing their duties. La. C. Cr. P. art. 789(A).

Article 789 permits replacement of a juror with an alternate juror when the juror is found "to have either the real or potential for bias in the deliberations." *State v. Tennors*, 2005-538, p. 15 (La. App. 3 Cir. 2/15/06), 923 So. 2d 823, 833.

18

The trial court has the discretion to decide whether a juror has become disqualified to perform his or her duties and, if so, what action to take. *State v. Fuller*, 454 So. 2d 119 (La. 1984); *State v. Samuels*, 52,640 (La. App. 2 Cir. 8/14/19), 277 So. 3d 925, *writ denied*, 19-01641 (La. 1/14/20), 291 So. 3d 681.

In *State v. Orphey*, *supra*, a juror informed the court on the second day of trial that she knew a lady who had entered the courtroom. That lady turned out to be the defendant's mother. The juror stated that she and the lady worked at the same school, but she did not know the lady's relationship to the defendant. The juror told the court that knowing the lady made her uncomfortable and how it would be difficult during deliberations and afterwards, but she acknowledged that knowing the lady should not keep her from deciding guilt or innocence and that she would do what the law required. Nevertheless, the court removed her and replaced her with an alternate juror because the court considered it to be too close of a relationship. Noting that the trial court listened to and evaluated the juror's answers to its questions and the attorneys' questions, the appellate court determined that the trial court had not abused its discretion in removing the juror.

Although the juror in *Orphey* answered that she did not know the lady's relationship to the defendant, the opinion states that she was his mother. The appellate court also concluded that it was obvious from the juror's dialogue with the court that she made the connection between the lady and the defendant. In the matter at hand, Gibbs did not know if the woman who attempted to get her attention was related to Moran, but a

19

reasonable assumption can be made that it was. This assumption is bolstered by defense counsel's behavior in not revealing her identity to the court.

While the juror in *Orphey* expressed her discomfort in remaining on the jury, Gibbs told the trial court that she would remain impartial. Certainly, the legal system appreciates the conscientiousness of Gibbs in reporting what can be accurately characterized as an attempt to influence her. Nevertheless, Gibbs was related to the woman in the audience, if only by marriage. Although the court viewed the issue mostly through the prism of whether the State was deprived of being able to challenge Gibbs since it lacked this knowledge during voir dire, the potential for bias and lack of impartiality was clearly present if Gibbs remained on the jury. The trial court did not abuse its discretion in ordering her removal from the jury.

***Motion for new trial***

Moran's appellate counsel contends that allegations of newly discovered material evidence required the trial court to conduct a hearing on the motion for new trial. Counsel asserts that the newly discovered testimony related directly to police actions involving Johns' handgun following the shooting. She further asserts that the location and condition of a gun prior to being handled by police is a significant issue in a case of self-defense as the jury could have been left with the impression that the magazine was not in the gun when Moran claimed it was shown to him.

The grounds for new trial are set forth in La. C. Cr. P. art. 851:

A. The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.

B. The court, on motion of the defendant, shall grant a new trial whenever any of the following occur:

20

. . . . .

> (3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty.

Generally, a motion for a new trial must be filed and disposed of before sentence. La. C. Cr. P. art. 853(A). However, when the motion for a new trial is based on art. 851(B)(3), the motion may be filed within one year after verdict or judgment of the trial court, although a sentence has been imposed. La. C. Cr. P. art. 853(B). Thus, the motion was timely filed.

La. C. Cr. P. art. 852 states that a motion for a new trial shall be tried contradictorily with the district attorney. However, that provision does not require an evidentiary hearing. *State v. Thomas*, 48,530 (La. App. 2 Cir. 12/4/13), 131 So. 3d 84. Instead, the method of hearing motions for a new trial is within the trial court's discretion and may be tried solely on affidavits. *Id*. Moran failed to file an affidavit in support of his motion.

Regarding newly discovered evidence, La. C. Cr. P. art. 854 states that a motion for a new trial based on ground (3) of art. 851 shall contain allegations of fact, sworn to by the defendant or his counsel, showing the names of the witnesses who will testify and a concise statement of the newly discovered evidence.

The name of the witness who would testify about the alleged newly discovered evidence was absent from Moran's motion for new trial, which stated:

> Defense avers that an eye-witness to the incident came forward after Mr. Moran was found guilty. Said witness will testify to the on-scene officers' handling of the handgun that was found near Samuel Johns. Specifically, Counsel understands that the witness saw an officer pick up a firearm from on or near the

21

decedent, remove the magazine from said firearm, and then place the firearm and clip near each other for photographing.

There was nothing for the trial court to hear after reading the unsupported allegations in the motion. Moreover, the alleged removal of the magazine had no bearing on the self-defense claim. For the foregoing reasons, we conclude the trial court did not err in denying the motion for new trial without conducting a hearing.

***Facebook posts***

Moran's appellate counsel argues that the Facebook posts were not relevant, did not mention the victim, and had the effect of painting Moran as a bad guy.

In general, courts may not admit evidence of other crimes or bad acts to show that a defendant is a man of bad character who acted in conformity with his bad character. La. C.E. art. 404(B)(1). However, the State may introduce evidence of other crimes or bad acts if it has established an independent relevant reason, namely, to show the defendant's motive, opportunity, intent, or preparation, or if the evidence relates to conduct constituting an integral part of the act or transaction that is the subject of the present proceeding. La. C.E. art. 404(B)(1); *State v. Brown*, 18-01999 (La. 9/30/21), 330 So. 3d 199.

The Louisiana Supreme Court discussed the concerns surrounding art. 404(B) evidence in *State v. Taylor*, 16-1124, p. 12 (La. 12/1/16), 217 So. 3d 283, 292:

> Code of Evidence article 404(B)(1) embodies the settled principle that evidence of other crimes may be admissible if the state establishes an independent and relevant reason for its admission. While the clear and convincing burden of proof set forth in *Prieur* is no longer mandated, other jurisprudential rules and guidelines derived from *Prieur* and its progeny

22

remain valid and applicable. Thus, the state is still required [to] provide the defendant with written notice before trial that it intends to offer prior crimes evidence. And, the safeguard in *Prieur* providing for a jury charge regarding the limited purpose for which other crimes evidence is presented remains valid. Moreover, even when the other crimes evidence is offered for a purpose allowed under Article 404(B)(1), the evidence must have substantial relevance independent from showing defendant's general criminal character and thus is not admissible unless it tends to prove a material fact at issue or to rebut a defendant's defense. Accordingly, the state cannot simply rely on a boilerplate recitation of the grounds for admissibility stated in La. C.E. art. 404(B). It is the duty of the district court in its gatekeeping function to determine the independent relevancy of this evidence. The district court must also balance the probative value of the other crimes, wrongs or acts evidence against its prejudicial effects before the evidence can be admitted.

(Internal citations omitted.)

Although evidence may be considered relevant and otherwise admissible under La. C.E. art. 404(B)(1), the trial court must still conduct a balancing test pursuant to La. C.E. art. 403. Regarding this balancing test, the *Taylor* court stated:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." La. C.E. art. 403. Any inculpatory evidence is "prejudicial" to a defendant, especially when it is "probative" to a high degree. As used in the balancing test, "prejudicial" limits the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial. "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."

*Id*. at p. 18, 217 So. 3d at 295-6 (internal citations omitted).

A trial court's ruling on the admissibility of evidence of other crimes will not be overturned absent an abuse of discretion. *State v. Floyd*, 51,869 (La. App. 2 Cir. 6/27/18), 250 So. 3d 1165, *writ denied*, 18-1292 (La. 2/25/19), 266 So. 3d 288. The introduction of inadmissible other crimes

23

evidence results in a trial error subject to harmless error analysis on appeal. *Id.* An error in the admission of other crimes evidence is not harmless unless a reviewing court determines that the verdict actually rendered was surely unattributable to the error. *State v. Brown*, *supra*; *State v. Johnson*, 94-1379 (La. 11/27/95), 664 So. 2d 94.

The sixteen posts read to the jury showed that Moran had killing on his mind. Among the posts were:

> "… I'm glad I learn how to get away with murder lol but I ant never kilt nobody . . . I don't want nobody life so don't attempt to take my s*** or f*** with my people . . ." (November 29, 2017)

> "We gone start it over I'm glade I ant never snitched on nobody in real life I can't have that label on my back but I will kill if you make me do it who talking to y'all am I in the streets or do I got somebody else typing if I catch you I'm gone kill you it's simple I don't like gangster snitch . . ." (November 29, 2017)

> "I still kill if people don't respect me I just got to do it the right way respect everybody folks and you don't have to worry about shit N**** I'm just a clown with a thousand different personalities I will kill any person who think they gone hurt me or my #AFNF" (November 29, 2017)

> "I been had the key to my city and I don't leave I'm killing everybody say me Trey and Debo name f*** the Feds we kill" (November 30, 2017)

> "If yo want to kill somebody I need money I will kill police anything moving rs" (November 30, 2017)

> "Dp and Pooman next somebody please kill them if the laws pick you up blame it on me and play stupid Stupid" (December 2, 2017)

> "Killer rode call if you love me and God kill Dp and Pooman if somebody ride for them kill them to" (December 2, 2017)

> "The Feds put him around y'all kill him 13 said he a Snake kill him he trying to snitch" (December 2, 2017)

> "Ratchet Nation Bitch let's kill all snakes and cops to if they got on mask I'm just lieing y'all go read your Bible I'll Bitch before I be under yo house" (December 2, 2017)

"God got me He watch my back and I'm killing everything in the front" (December 2, 2017)

At the art. 404(B) hearing, the State maintained the Facebook posts showed evidence of proof of motive, absence of mistake or accident, and that Moran was the aggressor. The trial judge ruled they should be admissible to the extent they contained threats. The trial judge stated that the "clincher" for him was when Moran posted that he would kill someone who disrespected him or thought they were going to harm him.

Although the victim was not mentioned by name or nickname in any of the posts, the posts show that Moran was in a mindset to kill various individuals, including the police, or incite others to do his dirty work for him, in the days leading up to the murder of Johns. They showed Moran had the intent to kill and did not act in self-defense. The posts are certainly relevant under these circumstances when Moran asserts it was necessary for him to kill Johns in order to save his own life. Moreover, their probative value outweighed any prejudicial effect.

***Pro se assignments of error***

Moran has filed two *pro se* assignments of error. The first concerns the removal of the juror that has already been addressed in this opinion. The second concerns the trial court allowing jurors to view his Miranda rights form and the autopsy report during deliberations.

Upon the request of a juror and in the discretion of the court, the jury may take with it or have sent to it any object or document received in evidence when a physical examination thereof is required to enable the jury to arrive at a verdict. La. C. Cr. P. art. 793(A). We discern no error by the trial court in allowing the jury to view these documents on the request of the

25

jury.  Moreover, even operating under the assumption that the trial court erred in permitting this, any error was harmless.  Moran's argument is without merit.

### *Error patent*

The trial court did not completely advise Moran of the prescriptive period for seeking post-conviction relief ("PCR"), as required by La. C. Cr. P. art. 930.8(C).  Therefore, we advise Moran, by way of this opinion, that no application for PCR shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under La. C. Cr. P. arts. 914 or 922.  *State v. Kelly*, 52,731 (La. App. 2 Cir. 6/26/19), 277 So. 3d 855, *writ denied*, 19-01845 (La. 6/3/20), 296 So. 3d 1071.

## CONCLUSION

For the foregoing reasons, Furlonzo Moran's conviction and sentence are affirmed.

**AFFIRMED**.