Judgment rendered August 9, 2023.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 55,256-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                                    Appellee

versus

JAVIER A. HERNANDEZ                                   Appellant

* * * * *

Appealed from the
Twenty-Sixth Judicial District Court for the
Parish of Webster, Louisiana
Trial Court No. 96,252

Honorable Charles A. Smith, Judge

* * * * *

LOUISIANA APPELLATE PROJECT              Counsel for Appellant
By: Peggy J. Sullivan

JAVIER A. HERNANDEZ                      Pro Se

J. SCHUYLER MARVIN                       Counsel for Appellee
District Attorney

HUGO A. HOLLAND, JR.
RICHARD R. RAY
Assistant District Attorneys

* * * * *

Before COX, STEPHENS, and MARCOTTE, JJ.

**COX, J.**

This criminal appeal arises out of the 26th Judicial District Court, Webster Parish, Louisiana. Defendant, Javier Hernandez ("Hernandez"), was unanimously convicted of molestation of a juvenile and sentenced to five years at hard labor. Hernandez now appeals his conviction, arguing insufficiency of the evidence in establishing that he behaved in a lewd and lascivious manner toward the victim and that he acted in a position of control or supervision over the victim. For the reasons set forth below, Hernandez's conviction and sentence are affirmed.

## FACTS

M.M., the victim in this matter, was born December 27, 2005, and was 14 years old when she was hired to work at Los Compas Mexican Restaurant during the summer of 2020. At this time, the restaurant was co-owned by Hernandez and his wife, Lacee Hernandez ("Lacee"). M.M., and two other victims, L.B. and H.I., later reported that Hernandez had engaged in inappropriate behavior with them. Following M.M. and H.I.'s Gingerbread House interviews, Hernandez was arrested and on December 16, 2020, was charged with molestation of a juvenile, in violation of La. R.S. 14:81.2(A)(1) and 14:81.2(B)(2).

On May 2, 2022, trial commenced, wherein the following testimony was adduced:

First, Alisha Crane ("Crane"), M.M.'s aunt and legal guardian, testified that she, her brother, Troy Manning ("Manning"), and her sister, Ashley Lamb ("Lamb"), all worked at Los Compas together. Crane testified that she also got M.M. a job working at the restaurant for a few months. She stated that since she and Lamb lived together with M.M., and Manning lived

nearby, someone was always there to supervise and give M.M. a ride to and from work when she was scheduled to work. Although she never witnessed any inappropriate behavior between Hernandez and M.M., Crane recalled an incident in which Hernandez asked if M.M. was allowed to drink, in which he stated, "You know, it won't hurt her. Y'all are at the restaurant. She's going home with you." Crane stated that in response, she told Hernandez twice that M.M. was underage and was not allowed to drink.[1]

Crane further testified that despite riding to and from work with her, M.M. never told her that anything inappropriate occurred between her and Hernandez and that she only learned about the allegations after she spoke with H.I. However, Crane testified that while she felt that M.M. could have discussed this with her, she was not surprised that M.M. did not disclose this information. Crane elaborated that M.M. had been molested when she was younger and immediately reported it, to which M.M.'s biological mother dismissed the allegations and accused M.M. of lying, and since then, M.M. had always been closed off and tended not to talk about her feelings.

Regarding H.I., Crane testified that she was close with H.I.'s mother and while not biologically related, considered herself to be H.I.'s aunt, and H.I. and M.M. referred to each other as cousins and communicated through social media. Crane testified that when H.I. started work at the restaurant, M.M. had already quit, so their shifts never overlapped. Crane stated that H.I. was a minor when she started working, and only worked there for two days. Crane testified that after H.I.'s first day, she told Crane that

---

[1] Crane also explained that although the bar was centrally located in the restaurant, where it could be seen by waitstaff, it was partially enclosed by panels with only an opening for an entrance, so she could not always see if someone was at the bar. Crane testified that while she saw M.M. sitting at the bar once, she told M.M. that she could not be there and that she had not known M.M. to drink.

Hernandez and Lacee sent her a friend request on Facebook and that Hernandez messaged her. Crane stated that she told H.I. to simply block them and not to respond to anything.

Crane testified that on H.I.'s second day at the restaurant, they worked the same shift, but Hernandez sent her to the store to pick up items for the restaurant. Crane stated this was unusual because Hernandez did not usually work Sunday shifts, and she was never asked to pick items up items before this time. Crane testified that although she did not drive to work that day, Hernandez gave her his keys and she left at his order so that the only other adults present with H.I. were Manning and another waitress, Savannah. Crane made clear that because Hernandez and Lacee owned the restaurant, if either ordered an employee to do something, they did as they were told.

Crane stated that a few days later, H.I. called and informed her about several incidents in which: (1) Hernandez asked H.I. to unblock him on Facebook and sent several explicit messages, and (2) Hernandez called H.I. into his office after Crane left to run errands, and groped H.I. Crane testified that after she convinced H.I. to tell her mother about the incidents, H.I. revealed that M.M. confided that Hernandez had done something similar to her as well. Crane stated that she then spoke to M.M., who admitted that Hernandez had been inappropriate with her and both girls provided their statements to officers.[2]

---

[2] Chief of Police for the Dixie Inn Police Department, Detective James Edwards ("Det. Edwards"), also testified generally that M.M. filed a preliminary report with officers and read her statement aloud for the jury. Det. Edwards stated that sometimes people leave events out of their initial statement. He testified that after the victims were interviewed, he secured an arrest warrant and searched the restaurant for employee records, and discovered that there were no records for any of the workers.

Detective Heather Boucher also testified and generally gave an overview of crime lab procedure. Det. Boucher testified that in this case, no rape kit or physical

Next, the State called M.M., who identified Hernandez in open court. The State introduced and played a portion of M.M.'s recorded Gingerbread House interview and M.M. testified generally that she worked at Los Compas restaurant for about three months when she was 14 years old. M.M. stated that although her aunts or uncle were present when she was scheduled to work, Hernandez, nevertheless, engaged in inappropriate behavior with her. M.M. then recalled an incident in which Hernandez "poked her butt" with his finger. M.M. stated that she initially did not think much of the matter because Hernandez said "Excuse me," but that he would frequently hug her as a pretense to touch her bottom. M.M. stated that Hernandez would also call her into his office where no one would see, and touch her.

M.M. testified that Hernandez touched her more than once over the course of her employment and recalled several statements in which Hernandez: (1) told M.M. that he and one of the cooks would take her to Ruston to have sex; (2) stated that he would pay M.M. any amount of money to "have her butt"; (3) mentioned that M.M. could wash cars in a bikini, to which Manning told Hernandez no; and (4) commented that M.M. had sexy shoes, to which M.M. explained that she thought Hernandez might not have known what he was saying and did not specifically intend to call her sexy.

M.M. then testified to two incidents in which Hernandez gave her and L.B. alcohol at the restaurant. M.M. stated that during that time, there were only a few customers present as well as Manning, Crane, and a few cooks. M.M. explained that Hernandez initially left the alcohol at the bar, but then moved the drink to his office, so that the only person who witnessed her

_____

examination was conducted because the report was done outside of the 72-hour window from the date of the incident.

4

drinking was L.B. M.M. stated that when either girl went to Hernandez's office to get another drink, he would touch or grope them. She stated that when her shift ended and she rode home with Manning, she felt "woozy" and had trouble walking.

M.M. then recalled another incident in which Hernandez touched her twice while in the restroom. M.M. stated that the first time Hernandez touched her, he helped her change the toilet paper dispenser, and after Lamb came in the restroom and left, he touched her bottom and said, "There you go, girl." She stated that the second time Hernandez touched her, she was refilling the soap dispenser when he entered the restroom to tell her he was leaving and touched her chest and bottom. M.M. stated that she was unaware if anyone saw Hernandez behaving inappropriately toward her, but she believed that Hernandez made sure no one was around when he touched her. M.M. admitted that while she did not discuss the incidents with her aunts and uncle, she did confide in L.B., and later H.I. M.M. admitted that after she quit, she went back to the restaurant to help a friend. M.M. stated that although she was still terrified of Hernandez, she felt better going back because she was free to leave because she no longer worked for him and did not have to wait on her aunts or uncle to take her home.

L.B. then identified Hernandez in open court and testified that she worked at Los Compas for approximately two months. L.B. stated that when she worked there, there was not always a supervising adult present and if there was, it was usually Hernandez or Manning. She also explained that because Hernandez was one of the owners, if he gave an order, employees would have to follow it. L.B. then testified that she moved in with Hernandez and Lacee after her relationship ended. L.B. stated that while

5

there, Hernandez would show her pictures of naked women that he paid for, and asked if either she or a friend would send him similar pictures and he would pay for them, but she told him no. L.B. testified that Hernandez's actions elevated to him physically touching her.

L.B. explained that she would ask Hernandez to stop, and while he sometimes listened to her, other times, she would have to physically remove his hands. L.B. then recalled incidents in which Hernandez followed her into the restroom while she was cleaning and touched her chest, attempted to pull her into his office to touch her, or try and put his hands in her pants. L.B. noted that if others were present, Hernandez would not do or say those things.

Regarding M.M., L.B. testified that M.M. would often confide in her about things Hernandez said. L.B. stated that while she did not see Hernandez touch M.M., she did hear him say inappropriate things to M.M., but stated that on one occasion, Hernandez asked her to make M.M. have sex with him. L.B. also testified that Hernandez would give her and M.M. alcohol on at least four or five different occasions and that it would be enough to get them intoxicated.

H.I. also identified Hernandez in open court and generally testified that she worked at Los Compas for two days before she quit.[3] H.I. explained that she no longer wanted to work at the restaurant because of Hernandez's behavior and the series of explicit and inappropriate messages he sent her. The State introduced several Facebook messages Hernandez sent H.I., and

---

[3] H.I. clarified that while Crane referred her for the job, Manning actually hired her. H.I. also clarified that when she started working, M.M. had already quit so they never worked a shift together.

Lacey McGrew ("McGrew"), H.I.'s mother, testified that H.I. showed her the messages Hernandez sent her, which primarily consisted of messages in which Hernandez attempted to proposition H.I. to send him nude pictures for money.

McGrew testified that throughout the messages, Hernandez would constantly ask if H.I. or a friend would send him pictures and would ask H.I to either delete the messages or keep them private. McGrew stated that on several occasions, H.I. told Hernandez that she was only 16 and did not want to send him anything or be involved with him. McGrew also testified that H.I. told her about several incidents in which Hernandez would rub his hand down her back and her bottom, and offered her $100 dollars for pictures.

Next, Manning testified generally that he worked at Los Compas for about 15 months. Manning testified that while he did not see anything inappropriate happen between Hernandez and M.M., he did see an incident in which Hernandez walked up to L.B. and put his hand on the inside of her thigh and she moved his hand. Manning stated that he could not recall ever seeing M.M. drunk and that she never disclosed any inappropriate behavior to him, but noted that the two were not particularly close. Lamb also testified that she did not see any inappropriate behavior between Hernandez and M.M. and that M.M. never told her about any incidents that occurred, but noted that M.M. tended to be closed off and the two were not close.

Regarding M.M.'s testimony that Hernandez touched her in the restroom, Lamb testified that when she entered the restroom, she saw M.M. inside the stall and Hernandez on the outside. Lamb stated that she asked what was going on, and Hernandez explained that he was showing M.M. how to change the toilet paper dispenser. Lamb stated that the two then left,

and she used the restroom. Lamb, however, admitted that she did not see what occurred before she entered the restroom. Lamb stated that she never saw M.M. drinking at work, and couldn't recall a conversation in which Hernandez told M.M. her shoes were "sexy." Finally, Lamb stated that because Hernandez and Lacee owned the restaurant, they were the supervisors and if either gave an order, employees would have to follow it.

On May 4, 2022, the jury returned a unanimous verdict finding Defendant guilty of molestation of a juvenile where the offender has control or supervision over the juvenile. On May 23, 2022, Hernandez filed a motion for post-verdict judgment of acquittal and motion for new trial, in which he alleged that there was insufficient evidence to support his conviction. However, no contradictory hearing was held to address either motion. On June 6, 2022, the trial court denied both motions. On August 8, 2022, the sentencing hearing was held, and after reviewing Hernandez's criminal history and the factors listed under La. C. Cr. P. art. 894.1(A) and (B), the trial court sentenced Hernandez to five years at hard labor.

Hernandez now appeals his conviction and sentence.

## DISCUSSION

On appeal, Hernandez argues that the State failed to prove beyond a reasonable doubt that he had control or supervision over M.M., or that he committed "lewd or lascivious acts." Specifically, Hernandez contends that his status as owner alone, without further evidence or testimony of specific acts, is insufficient to establish that he exercised any control or supervision over M.M. Hernandez further argues that M.M.'s statements and testimony contained several inconsistencies that prevented the State from establishing that he committed any "lewd or lascivious acts."

8

In particular, Hernandez highlights two incidents[4] in which he asserts M.M.'s statements or testimony was either contradicted by testimony from other witnesses or did not reflect that he committed any "lewd or lascivious acts." First, Hernandez maintains that M.M.'s claim that he provided her and L.B. with alcohol under the pretense of getting both girls in his office to touch them, is unfounded. He argues that other than L.B., no one, including customers or employees, saw him give either L.B. or M.M. alcohol. He notes that in contrast to M.M.'s statements that she only drank once in the restaurant, L.B. testified that Hernandez gave both girls alcohol on at least four to five different occasions. Moreover, he notes that despite M.M.'s claim that on the night in question, she was "woozy" and could barely stand, Manning, who drove her home, testified that he never saw Hernandez give M.M. alcohol and M.M. did not appear intoxicated.

Next, Hernandez argues that M.M.'s claim that he touched her in the restroom was directly contradicted by Lamb's testimony. Hernandez first notes that M.M. initially testified that he touched her once, but later claimed he touched her two times. Hernandez further argues that M.M. claimed that, while they were in the restroom, Lamb entered, and Hernandez touched her bottom after Lamb left. Hernandez contends, that contrary to this statement, Lamb testified that once she entered the restroom, both he and M.M. left the restroom.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to

---

[4] Hernandez also notes several other incidents in which M.M. accused him of touching her inappropriately, to which he primarily argues that there were no witnesses to those incidents, no one testified to ever seeing any inappropriate behavior between the two, M.M. never reported any of the incidents to Lamb or Manning, and that M.M. only reported the incident after H.I. filed her report.

the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004). This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the factfinder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517.

In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. *State v. Coffey*, 54,729 La. App. 2 Cir. 9/21/22), 349 So. 3d 647, *writ denied*, 22-01574 (La. 12/20/22), 352 So. 3d 89; *State v. Wilson*, 50,418 (La. App. 2 Cir. 4/6/16), 189 So. 3d 513, *writ denied*, 16-0793 (La. 4/13/17), 218 So. 3d 629. Likewise, the sole testimony of a sexual assault victim is sufficient to support a requisite factual finding. *Id.* Such testimony is sufficient even where the state does not introduce medical, scientific, or physical evidence to prove the commission of the offense by the defendant. *Id.*

The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness. *State v. Higgins*, 03-1980, p. 17 (La. 4/1/05), 898 So. 2d 1219, 1232, *cert. denied*, 546 U.S. 883, 126 S. Ct. 182, 163 L. Ed. 2d 187 (2005). When there is conflicting evidence about factual matters, the resolution of which depends on a determination of the credibility of witnesses, the matter is one of the weight, not the sufficiency, of the evidence. *Tibbs v. Florida*, 457 U.S. 31,

46, 102 S. Ct. 2211, 2220-21, 72 L. Ed. 2d 652 (1982); *State v. Reed*, 14-1980 (La. 9/7/16), 200 So. 3d 291.

To convict an accused of molestation of a juvenile, the state must prove beyond a reasonable doubt that the defendant: (1) was over the age of 17 and more than two years older than the victim; (2) committed a lewd or lascivious act upon the person or in the presence of any child under the age of 17; (3) had the specific intent to arouse or gratify the sexual desires of himself or the victim; and (4) committed the act by use of force, duress, psychological intimidation or by the use of influence by virtue of a position of control or supervision over the juvenile. La. R.S. 14:81.2; *State v. Lewis*, 52,367 (La. App. 2 Cir. 11/14/18), 260 So. 3d 1220. A lewd or lascivious act is one which tends to excite lust and to deprave morals with respect to sexual relations and which is indecent. *State v. Redfearn*, 44,709 (La. App. 2 Cir. 9/23/09), 22 So. 3d 1078, *writ denied*, 09-2206 (La. 4/9/10), 31 So. 3d 381.

The harsher penalty provision for molestation of a juvenile where the offender has control or supervision over a juvenile exists because an offender who has control or supervision over a juvenile is in a position of trust. *Id*. The meaning of the phrase "influence by virtue of a position of control or supervision" in La. R.S. 14:81.2 is not restricted in its application to persons to whom the parent entrusts the child for care, usually for a fee, such as babysitters, childcare workers, or teachers. *Id*. Rather, the statute permits finding evidence of supervision or control by noncustodial parents, relatives, friends, and neighbors of young victims. *Id*. Living in the home with the victim, acting as a father figure to the victim, and exercising emotional control over the victim have been found to be sufficient to support

a finding of supervision or control. *Id.* Louisiana courts consider the following factors when determining whether a defendant used influence by virtue of his position of supervision or control over the victim: (1) the amount of time the defendant spent alone with the victim;[5] (2) the nature of the relationship between the victim and the defendant; (3) the defendant's age; and (4) the defendant's authority to discipline. *Id.*

In this case, it is undisputed that at the time of the offense, M.M. was only 14 years old, Hernandez was over the age of 17, and the age difference between M.M. and Hernandez was more than two years. The only issues, therefore, are whether Hernandez's conduct was considered "lewd and lascivious" and whether he had a position of supervision or control over M.M. After reviewing this record in its entirety, we find that the evidence was sufficient to prove that Hernandez committed the instant offense.

First, M.M. testified that on multiple occasions throughout her employment at Los Compas, Hernandez either made multiple inappropriate comments to her, including a statement that he and another employee would have sex with her, and the implied solicitation of M.M. that he would offer any amount of money to "have her butt." Accompanying such remarks was M.M.'s testimony that Hernandez often touched or groped her breasts or bottom, and on at least one occasion, provided her with alcohol in the confined privacy of his office where he could again proceed to touch her bottom.

---

[5] While a busy restaurant may not be the typical environment in which a manager would spend time alone with his employee, in this case, testimony reveals that Hernandez carved time out to be alone with M.M., as evidenced by both M.M. and L.B.'s testimony that he placed alcohol in his office, away from the open restaurant, to get each girl away from a public space.

To corroborate M.M.'s testimony that Hernandez often engaged in this, both L.B. and H.I. testified that Hernandez attempted to solicit vulgar pictures from them in exchange for money. L.B. further testified that on numerous occasions Hernandez would grope her, often attempting to pull her into his office to touch her and that on some occasions she would have to physically remove his hands from her body. Importantly, L.B. testified that M.M. often confided in her about Hernandez's behavior and although she did not see him touch M.M., she did hear remarks he made to M.M. and recalled an incident in which Hernandez asked her to proposition M.M. for him.

Next, we note that as both co-owner and supervising manager, it is clear Hernandez had supervising authority over each employee, including M.M. Irrespective of M.M.'s family working at the restaurant, Hernandez, as testified to by several witnesses, maintained a position of authority over *all* employees, which arguably included the power to hire and fire, set compensation, and assign work responsibilities, such that if he assigned a task to any particular employee, they were required to act and carry out that assignment. As such, we find that Hernandez, as both an adult and employer, had a position of authority over M.M. that superseded the presence of her family members. Given the totality of the testimony, we find that his actions were lewd and lascivious and reflected Hernandez's intent to excite himself by virtue of his position of control or supervision over M.M.

Moreover, any inconsistencies in M.M.'s testimony or statements were fully considered by the jury; credibility determinations are matters of weight, not sufficiency and as such, do not cause the evidence to be

13

insufficient to convict. Accordingly, this assignment of error is without merit.

Hernandez further asserts that the trial court erred in denying both his motions for new trial and post-verdict judgment of acquittal before a contradictory hearing was held; in support, Hernandez cites La. C. Cr. P. arts. 852 and 860. With respect to the motion for new trial, Hernandez primarily asserts that the State did not provide sufficient evidence to convict of the instant offense and based on the evidence presented, the verdict was contrary to the evidence presented. We disagree.

The grounds for which a new trial may be granted under art. 851, in relevant part, include:

> A. The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
>
> B. The court, on motion of the defendant, shall grant a new trial whenever any of the following occur:
>
>> (1) The verdict is contrary to the law and the evidence.
>> . . .
>> (5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.

Our Court has previously provided "the method of hearing motions for a new trial is within the trial court's discretion." *State v. Moran*, 54,281 (La. App. 2 Cir. 5/25/22), 338 So. 3d 1229, *writ denied*, *stay denied*, 22-00935 (La. 10/12/22), 348 So. 3d (La. 2022). Moreover, while art. 852 provides that a motion for new trial shall be tried contradictorily with the district attorney, the provision does not require an evidentiary hearing. *Id.* Further, the decision to grant or deny a hearing before deciding on a motion

for a new trial based on a verdict contrary to the evidence is committed to the trial court's wide discretion. *State v. Daspit*, 167 La. 53, 118 So. 690 (1928).

In *State v. Thomas*, 48,530 (La. App. 2 Cir. 12/4/13), 131 So. 3d 84, the defendant filed a motion for a new trial based upon newly discovered evidence which included supporting affidavits. The trial court did not conduct an evidentiary hearing and this court found that the trial court did not err in failing to do so. This court stated, "If the reading of the motion imparts to [the trial judge] sufficient knowledge to enable him to intelligently dispose of the matter, he cannot be arbitrarily required to delay his ruling for the purpose of further hearing or argument." *Id*. at 91, citing *State v. Varnado,* 154 La. 575, 97 So. 865, 868 (La. 1923). Here, Hernandez's motion for a new trial is based not on newly discovered evidence, but rather insufficient evidence. The trial court presided over the trial and heard all of the evidence presented. The court was capable of considering and disposing of defendant's motion without further argument. Further, this court has considered Hernandez's assignment of error based upon insufficient evidence and has found it to be without merit.

Regarding Hernandez's motion for post-verdict judgment of acquittal, we note that, in brief, he cites La. C. Cr. P. art. 860, which concerns motions in arrest of judgment and generally requires a contradictory hearing with the district attorney. However, Hernandez filed his motion for post-verdict judgment of acquittal pursuant to La. C. Cr. P. art. 821, which has no requirement that a contradictory hearing be held before the trial court rules

15

on the motion. Therefore, the trial court did not err in denying the motion on this basis.

This Court further notes both motions were filed on May 23, 2022, the trial court denied both motions on June 2, 2022, and Hernandez was later sentenced on August 8, 2022. Neither party, from the time in which the motions were denied until the sentencing hearing commenced, made any motions or contemporaneous objections regarding the denial of the motions before Hernandez was sentenced. Given that both parties had sufficient time to address the denial of both motions, and the trial court's wide discretion to deny the motions, we find no error in the denial of either motion.

## CONCLUSION

For the foregoing reasons, Hernandez's conviction and sentence are affirmed.

**AFFIRMED.**